******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., dissenting. Our witness tampering statute, General Statutes § 53a-151 (a), prohibits anyone who believes "that an official proceeding is pending or about to be instituted" from "induc[ing] or attempt[ing] to induce a witness to testify falsely . . . ." The terms "official proceeding," "witness," and "testify" each have a well-known meaning in the law. The three terms, working together in the same statutory provision, establish a clear legislative purpose to criminalize only words or conduct intended to influence another person to make a false sworn statement, or to desist from making a true sworn statement, in an "official proceeding." An "official proceeding" is statutorily defined as "any proceeding held or which may be held before any legislative, judicial, administrative or other agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner or notary or other person taking evidence in connection with any proceeding." General Statutes § 53a-146 (1). A police investigation plainly is not such a proceeding. Indeed, we previously have recognized that our witness tampering statute does not include "situations in which the defendant believes that only an investigation, but not an official proceeding, is likely to occur." *State* v. *Ortiz*, 312 Conn. 551, 570, 93 A.3d 1128 (2014); see id., 568 (agreeing "that the legislature restricted the scope of the witness tampering statute by omitting [the] words ['investigation,' 'inform,' and 'informant']"). Compare General Statutes § 53a-151 (a) (limiting witness tampering to any person who believes "that an official proceeding is pending or about to be instituted"), with 2 A.L.I., Model Penal Code and Commentaries (1980) § 241.6 (1), p. 162 (witness tampering extends to any person who believes "that an official proceeding *or investigation* is pending or about to be instituted" (emphasis added)).

The majority concludes that the evidence in the present case was sufficient for the jury to find beyond a reasonable doubt that the defendant intended to induce a witness to testify falsely in an official proceeding when she texted her on-again, off-again boyfriend, shortly after he had been in a physical altercation with her other on-again, off-again boyfriend, that they "needed to be on the same page" and "stick with the same story . . . ." I disagree. In light of the evidence before the jury and the state's theory of the case at trial, I believe that, although the evidence is sufficient to support a reasonable inference that the defendant intended to tamper with a suspect in *a police investigation*, it is insufficient to support a reasonable inference that she intended to tamper with a *witness* in an *official proceeding*. Because such conduct falls outside the scope of our witness tampering statute, I would reverse

the judgment of the Appellate Court upholding the defendant's witness tampering conviction. Accordingly, I respectfully dissent. In doing so, I note my agreement with the well-reasoned dissenting opinion of Justice D'Auria.

I

As both the Appellate Court and the majority recognize, "this case is replete with conflicting testimony regarding the timing and nature of the relationships between the various parties, as well as the events of the night of July 24, 2015, and the early morning of July 25, 2015. It was for the jury, and not [the] court, to resolve discrepancies in the testimony." *State* v. *Lamantia*, 181 Conn. App. 648, 650 n.1, 187 A.3d 513 (2018); accord footnote 3 of the majority opinion. The following facts, which the jury reasonably could have found, are construed in the light most favorable to sustaining the jury's verdict. See, e.g., *State* v. *Elmer G.*, 333 Conn. 176, 183, 214 A.3d 852 (2019).

The defendant was in, or recently had been in, a romantic relationship with Jason Rajewski at the same time that she also was romantically involved with David Moulson. The entanglement led to a confrontation between the two men. During the early morning hours of July 25, 2015, Moulson left a bar in Norwich to follow the defendant, Rajewski, and Earl F. Babcock to a house at 18 Bunny Drive in Preston. The undisputed testimony at trial established that Moulson had followed the defendant in the past using a tracking application installed on her cell phone.

Moulson arrived at 18 Bunny Drive at approximately 2:30 a.m. A physical altercation between Moulson, Rajewski, and Babcock immediately ensued. The incident took place in the driveway outside the house while the defendant was inside. The defendant did not observe the physical altercation and was unaware of its occurrence until she saw a bloodied Moulson running toward the house, with Rajewski and Babcock following behind him. The defendant informed Rajewski and Babcock that they should leave because Moulson was calling the police.

Sometime after Rajewski left Bunny Drive, but before Jonathan Baker, a Connecticut state trooper, arrived at Rajewski's house to investigate the incident, the defendant sent Rajewski a series of text messages. Unfortunately, the text messages were not preserved or introduced into evidence at the defendant's trial. In the absence of this direct evidence, Baker described the text messages for the jury, after refreshing his recollection by reviewing his police report, which itself was never admitted into evidence.[1] According to Baker,[2] the defendant's first text message to Rajewski "essentially [said that] the cops are coming, make sure you're bloody and . . . [that Moulson] is abusive to her." Rajewski

responded "okay." Baker informed the jury that the defendant then sent another text message telling Rajewski "[t]o wait outside because the police were coming. Then she [told Rajewski that] he's going to stand by her side and to delete the conversation." In her next text message, Baker continued, the defendant instructed Rajewski to "tell the police . . . that [Moulson] stalks her." Baker testified that "[the defendant] said [Moulson] was bloody when he got there. [The defendant] told [the troopers] that [Moulson] was in a bar fight somewhere else. And . . . [Rajewski] only followed [the defendant] to that residence [on Bunny Drive] because he loves her." According to Baker, "[e]ssentially, [the defendant was] telling [Rajewski] that they need to stick with the same story and it would be good. They have to match."

Baker testified that Rajewski became upset and told the defendant "no, I'm telling the truth. [Moulson] tried to kick my ass, so I beat him up. . . . [E]nough is enough." Baker added that the defendant next texted Rajewski "a [question] mark" and then the following message: "[Moulson's] ducked up. Your story has to match mine. [Moulson] looks crazy. He deserves it because of the beatings he's [done] to me." Baker continued: "[The defendant was] telling [Rajewski] that [Moulson] told [the police] that [Rajewski] attacked [Moulson] in his car." Rajewski responded that "there's no story," and "[Rajewski] essentially [got] angry with [the defendant], now saying that [she had] brought [Moulson] there for [Rajewski] to do that. She says [she] didn't know." According to Baker, Rajewski texted the defendant that he "didn't know [Moulson] was going to come out swinging like an idiot. [Rajewski] then [texted the defendant] that he's not going to tell a story, [that] he's just going to tell what happened. He—rephrase. That was [the defendant] saying not the story, just what I know, I saw nothing." Baker testified that Rajewski then texted the defendant that "the cops are here now. And the last two [texts from the defendant were sent] either while I'm talking to [Rajewski] or while [Rajewski was] being processed." In those final texts, the defendant asked Rajewski if "he [took] the keys" and indicated that "the truth is fine, but you two [i.e., Rajewski and Moulson] are telling two different stories, [and] you need to be on the same page."

The state's legal theory at trial warrants mention because it contains a fatal flaw that adumbrates the evidentiary deficiency requiring reversal of the defendant's witness tampering conviction. In its closing argument, the state informed the jury that, in order to find the defendant guilty of tampering with a witness, the state need only prove that the defendant intended to tamper with a witness in *a police investigation*. The state argued that "the requirement of the defendant believing an official proceeding was about to be instituted can be satisfied if the defendant knew that she

could have been implicated in a crime and she asked, threatened, or induced a witness to withhold evidence from [the] police. It does not matter that it was in the investigative phase of the criminal justice process. It doesn't matter that the police were still figuring out what happened. *It just matters that she intended to prevent that witness from speaking with [the] police or [from] telling the police the truth.*" (Emphasis added.) The state further argued that the defendant "[c]learly . . . knew that a proceeding ha[d] been instituted" and "[c]learly . . . knew an investigation was currently in [progress]" because she "knew the cops were involved" and she had spoken to the police. This theory of guilt was manifestly erroneous as a matter of law.

## II

Two points require comment before addressing the case law construing our witness tampering statute and the requirement that the defendant specifically intend to induce false testimony in an "official proceeding." Both points relate to a troubling lack of focus in the state's theory of criminal wrongdoing at trial. First, the state never informed the jury precisely which statement or statements in the defendant's text messages either were false or sought to induce Rajewski to testify falsely; nor did it identify for the jury the "official proceeding" in which the defendant expected Rajewski's testimony would occur (e.g., the prosecution of Rajewski, Moulson or Babcock, or some combination thereof, for the crime of assault or breach of the peace, the infraction of creating a public disturbance, or some other charge). These are not minor deficiencies in a prosecution charging a defendant with tampering with a witness (i.e. attempting to induce a witness to testify falsely) in an official proceeding. Although I do not doubt that the evidence is sufficient to conclude that the defendant intended to promote an inaccurate version of events in *some* fashion, it is a matter of significant concern to me that the state failed to identify the specific falsehood or the specific proceeding serving as the basis of the witness tampering conviction.[3] It was the state's burden to prove beyond a reasonable doubt that the defendant intended to induce "false testimony," and, in order to fulfill that burden, the state had to prove the falsity of one or more statements that the defendant asked Rajewski to make to the police. Although the defendant's suggestion that she and Rajewski should "match" their "stories" to be "on the same page" certainly is suggestive of a desire to provide a false version of one or more facts, the state neglected to identify precisely what part or parts of the defendant's "story" were false or were intended to induce false testimony, just as it failed to identify the official proceeding with which the defendant intended to interfere. In light of the unfortunate lack of specificity pervading the defendant's trial in this case, we should exer-

cise care on appeal to ensure that the evidence is sufficient to sustain a conviction under our witness tampering statute.

Second, the state erroneously informed the jury that a police investigation is an official proceeding, even though the statutory definition of an "official proceeding" plainly excludes police investigations. See General Statutes § 53a-146 (1). The state compounded this error by arguing that it had satisfied its burden of proof with respect to the defendant's belief that an official proceeding was pending or imminent because it had established that the defendant "knew the cops were involved" and, therefore, "[c]learly . . . knew that a proceeding ha[d] been instituted."[4] I recognize that the trial court properly instructed the jury on the essential elements of the offense, but, nonetheless, neither the trial court, defense counsel, nor the state corrected this egregious misstatement of law. See *State* v. *Otto*, 305 Conn. 51, 77, 43 A.3d 629 (2012) ("prosecutors are not permitted to misstate the law . . . and suggestions that distort the government's burden of proof are likewise improper" (citation omitted)). The state's reliance on an erroneous legal theory informs my view of the facts that the jury reasonably and logically could have found in the present case.

### III

I begin my analysis with the language of our witness tampering statute and the governing case law. Section 53a-151 (a) provides that "[a] person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding."[5] A "witness" is defined as "any person summoned, or who may be summoned, to give testimony in an official proceeding." General Statutes § 53a-146 (6). An "official proceeding" is "any proceeding held or which may be held before any legislative, judicial, administrative or other agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner or notary or other person taking evidence in connection with any proceeding." General Statutes § 53a-146 (1). "Thus, the witness tampering statute has two requirements: (1) the defendant believes that an official proceeding is pending or about to be instituted; and (2) the defendant induces or attempts to induce a witness to engage in the proscribed conduct. These requirements serve the purpose of part XI of the Connecticut Penal Code, in which § 53a-151 (a) is found, as they punish those who interfere with the courts and our system of justice." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 312 Conn. 562. These two requirements are conjunctive and interactive—the criminal conduct consists of words or conduct exhib-

iting an intent to induce false testimony *in an official proceeding.* See id., 554 ("[b]ecause the jury reasonably could have found that the defendant believed that an official proceeding was about to be instituted and that [the prospective witness] probably would be called to testify at that proceeding, we conclude that the jury reasonably could have inferred that the defendant intended to induce [the witness] to testify falsely or to withhold testimony at that proceeding"). Thus, any charge of witness tampering, if based on efforts by a defendant to influence a witness during a criminal investigation prior to the commencement of any "official proceeding," must be supported by direct or circumstantial evidence reflecting the defendant's intent to influence the testimony of a "witness" in that future proceeding.

As we recognized in *State* v. *Ortiz*, supra, 312 Conn. 568, our witness tampering statute is based on § 241.6 (1) of the Model Penal Code, which provides in relevant part that "[a] person commits an offense if, believing that an official proceeding *or investigation* is pending or about to be instituted, he attempts to induce or otherwise cause a witness *or informant* to . . . testify *or inform* falsely . . . ." (Emphasis added.) Model Penal Code and Commentaries, supra, § 241.6 (1) (a), p. 162. When it enacted § 53a-151, our legislature purposefully omitted the words "investigation," "informant" and "inform" because it intended to exclude tampering with a witness in a police investigation from the scope of criminal culpability under that statute, unless the defendant has the specific intent to interfere with an "official proceeding." See *State* v. *Ortiz*, supra, 568; cf. *Heirs of Ellis* v. *Estate of Ellis*, 71 S.W.3d 705, 713–14 (Tenn. 2002) ("When the legislature enacts provisions of a uniform or model act without significant alteration, it may be generally presumed to have adopted the expressed intention of the drafters of that uniform or model act. . . . However, when the legislature makes significant departures from the text of that uniform act, we must likewise presume that its departure was meant to express an intention different from that manifested in the uniform act itself." (Citation omitted.)). Thus, § 53a-151 plainly applies only when the defendant has the specific "intent to influence a witness' conduct at an *official proceeding.*" (Emphasis added.) *State* v. *Ortiz*, supra, 554. *Ortiz* thus identifies a critical outer limit to the reach of our witness tampering statute on the basis of the operative text and legislative history.[6]

The issue presented in this appeal is whether the evidence was sufficient to prove beyond a reasonable doubt that the defendant had intended to influence Rajewski's testimony in a future official proceeding when she sent him the text messages following his physical altercation with Moulson. To resolve this question, and "to distinguish culpable conduct from innocent conduct"; (internal quotation marks omitted) id.,

569; the statute directs us to focus on the defendant's state of mind rather than the actual status of the official proceeding. The defendant's belief regarding the pendency or imminence of an official proceeding is not measured by "temporal proximity" but, rather, by "probability of occurrence," because "mere temporal proximity does not sufficiently implement the goal of punishing the obstruction of justice." Id.; see also Model Penal Code and Commentaries, supra, § 241.6, comment 2, pp. 166–67 ("The prosecution must establish that the defendant held the specified belief but need not prove that a proceeding or investigation was in fact pending or about to be instituted. In assessing such belief, the word[s] 'about [to begin]' as [they appear] in this subsection should be construed more in the sense of probability than of temporal relation. What is important is not that the actor believe that an official proceeding or investigation will begin within a certain span of time but rather that [she] recognize that [her] conduct threatens obstruction of justice [in connection with such a proceeding].").

Our case law makes clear that § 53a-151 (a) applies to conduct intended to induce a witness to give a false statement to the police if—but only if—"a jury reasonably could infer" from that conduct that the defendant had "the requisite intent to induce the [witness] to lie" or to withhold testimony in a future official proceeding. *State* v. *Ortiz*, supra, 312 Conn. 564–65. For example, in *Ortiz*, we held that the evidence was sufficient to support a reasonable inference that the defendant had the requisite intent, even though an official proceeding was not pending or about to be instituted in a temporal sense at the time he threatened a witness to prevent her from giving a statement to the police, because the evidence was sufficient to support a finding that the defendant intended "not only [that the witness] withhold information from the police but also withhold testimony or provide false testimony at a future official proceeding." Id., 573. Likewise, in *State* v. *Cavallo*, 200 Conn. 664, 513 A.2d 646 (1986), we concluded that the evidence established the requisite intent because the state "introduced ample evidence to convince a reasonable finder of fact that, at the time of his attempts to so induce the woman, the defendant had known that an arbitration proceeding would soon be pending *and that, during the hearing, the woman would probably be called to testify about her meetings with the defendant* . . . . From this evidence, the jury could reasonably have inferred that the defendant intended to induce the woman to testify falsely." (Emphasis added.) Id., 673–74.

The fundamental flaw in the majority's reasoning is that it conflates the defendant's knowledge of the existence of a police investigation with the defendant's belief that a future official proceeding is probable, and, in conflating these two different mental states, the

majority permits the state to substitute a less demanding mens rea for the operative statutory requirement.[7] The present case illustrates the point. The defendant plainly knew that the police were investigating a minor crime involving a brief fight between two men, and her conduct solidly supports the conclusion that she wanted to avoid an arrest of Rajewski, one among multiple subjects of the investigation. But this state of mind is not enough to establish a violation of our witness tampering statute. To establish that the defendant engaged in criminally culpable conduct intended to "interfere with the courts and our system of justice"; (internal quotation marks omitted) *State* v. *Ortiz*, supra, 312 Conn. 562; the state must produce sufficient evidence for the jury reasonably to find that the defendant undertook her actions with the intent to induce the witness to testify falsely in a future official proceeding. That is, the state must prove not only that the defendant acted under the belief that an official proceeding was likely to be instituted, but also that she intended to induce the witness to lie in that proceeding. By allowing knowledge of the investigation alone to satisfy the state's burden of proof regarding the defendant's specific intent, the majority has effectively added back into the statute the very words that the legislature intentionally omitted when it adopted a modified version of § 241.6 (1) of the Model Penal Code.[8]

The facts of *Ortiz* are instructive because they serve to highlight what is missing here. The defendant, Akov Ortiz, allegedly murdered Louis Labbadia after discovering that Labbadia had given a statement to the police implicating him in the commission of a burglary. Id., 555. "[T]he police considered [Ortiz] a 'principal suspect' in Labbadia's murder." Id. The police questioned Ortiz' former girlfriend, Kristen Quinn, "who, at the time, did not provide the police with any useful information. . . . Quinn informed [Ortiz] that she was in contact with the police and did not want to be involved with [Ortiz] because she thought he might have been involved in Labbadia's murder." Id. About one week later, after Labbadia's body was discovered, the police found a "[d]istraught" and "upset" Ortiz on the Arrigoni Bridge in Middletown. (Internal quotation marks omitted.) Id. "[Ortiz] informed the officers that he was tired of being accused of things, of something he didn't do, and that anytime anything big ever happen[ed] in Middletown, he [was] blamed for it. Specifically, [Ortiz] stated that he had heard that there were warrants for his arrest out through the Middletown Police Department and that the Middletown police [were] trying to kill [him]." (Internal quotation marks omitted.) Id., 555–56. After he was taken to the hospital, Ortiz told the police that "he was tired of being accused of something he didn't do and that he was hearing that the police were accusing him of killing . . . Labbadia." (Internal quotation marks omitted.) Id., 556.

"In the following months, [Ortiz] knew that Quinn was speaking with the police." Id., 557. He nonetheless confessed to Quinn that he had killed Labbadia. Approximately two months later, Ortiz went to Quinn's home, displayed a small handgun and asked her to come outside. Ortiz "told Quinn that he had the gun for insurance if she told the cops about what he said about [Labbadia]. [Ortiz] said that if Quinn spoke to the police [her] house was going to go up in smoke . . . . [Ortiz] stated that he knew where Quinn's grandparents lived. [Ortiz] told Quinn that he was going to put [her down] on [her] knees, put the gun to [her] head and scare [her] straight." (Internal quotation marks omitted.) Id. "Quinn subsequently informed the police of these events." Id. Ortiz was arrested, charged, and convicted of, among other crimes, tampering with a witness. Id., 558.

On appeal, Ortiz argued that the evidence was insufficient to support his tampering with a witness conviction, but we rejected this claim because his intent to influence testimony in an official proceeding could be inferred under the circumstances. Id., 572–74. The evidence supporting this inference consisted of, among other things, Ortiz' belief that there "were warrants for his arrest out through the Middletown Police Department and that the Middletown police [were] trying to kill him." (Internal quotation marks omitted.) Id., 573. We determined that this evidence was sufficient to support a reasonable inference that, at the time he threatened Quinn, Ortiz "believed that an official proceeding probably would be instituted, *regardless of whether Quinn informed the police about the defendant's confession.*" (Emphasis added.) Id. Our inquiry in *Ortiz*, in other words, ultimately and necessarily turned on the defendant's intent with respect to the official proceeding itself. Our holding proves the point: "Because the jury reasonably could have found that [Ortiz] believed that an official proceeding was about to be instituted and that Quinn probably would be called to testify at that proceeding, we conclude that the jury reasonably could have inferred that [Ortiz] intended to induce Quinn to testify falsely or to withhold testimony at that proceeding." Id., 554.

In contrast to *Ortiz*, in the present case, there was no evidence to support a reasonable inference that, at the time she sent the text messages to Rajewski, the defendant subjectively believed that an official proceeding likely would be instituted or that Rajewski would be a witness in such a proceeding. Nothing in the defendant's text messages directly or indirectly references the presentation of formal charges or an actual criminal case that may follow the decision to prosecute, or the introduction of evidence at an eventual criminal trial. Cf. *State* v. *Sabato*, 321 Conn. 729, 748, 138 A.3d 895 (2016) (holding that defendant's "Facebook messages

amply supported a finding that the defendant believed that an official proceeding would probably occur" because, in those messages, "the defendant acknowledged that the police were 'getting warrants' and 'building a case' against him," and wrote that he would "eat the charge"); *State* v. *Cavallo*, supra, 200 Conn. 673 (holding that state had "introduced ample evidence to convince a reasonable finder of fact that, at the time of his attempts to [induce the witness to testify falsely], the defendant had known that an arbitration proceeding would soon be pending" because defendant himself initiated arbitration proceeding less than one month later); *State* v. *Mark*, 170 Conn. App. 241, 252, 154 A.3d 564 (evidence was sufficient to support reasonable inference that defendant believed there would be "official proceeding" because, among other reasons, defendant mentioned that "he did not want to leave evidence of the murder weapon at the scene"), cert. denied, 324 Conn. 927, 155 A.3d 1269 (2017).

I recognize that criminal defendants will not always verbalize their subjective intent or state the ultimate purpose of their efforts to obstruct justice. It will always be appropriate, and sometimes necessary, to look at the factual circumstances surrounding the defendant's conduct in each case to ascertain whether it is reasonable to infer that the defendant's attempt to induce a witness to give a false statement to the police was undertaken in contemplation of an official proceeding. Our case law implicitly recognizes that various factors inform this analysis, including, but not limited to, the severity of the crime under investigation,[9] the quantity and quality of the evidence, and the status of the relevant police investigation. See, e.g., *State* v. *Jordan*, 314 Conn. 354, 383, 102 A.3d 1 (2014) ("when an individual knows that there is significant evidence connecting him to the crime, a jury reasonably could infer that the individual believed that the investigation probably would progress into an official proceeding"); *State* v. *Foreshaw*, 214 Conn. 540, 543, 550–51, 572 A.2d 1006 (1990) (jury reasonably could have found that defendant believed an official proceeding was about to be instituted when she discarded murder weapon because, after she shot and killed victim in presence of numerous eyewitnesses, she told police that she had discarded weapon "so that she would not be caught with it"); *State* v. *Mark*, supra, 170 Conn. App. 253 ("the defendant knew that the victim's body was lying on the sidewalk in public view; surely the defendant was aware that an investigation and official proceeding probably would ensue when someone found the victim's body"); *State* v. *Guerrera*, 167 Conn. App. 74, 105, 142 A.3d 447 (2016) ("the jury could have inferred that the defendant was aware that a criminal prosecution was probable in light of the number of witnesses who had seen him with the victim, the threats he made to those witnesses to try to silence them, his knowledge that [his brother] told

people about killing the victim, and his firsthand knowledge of the murder and the assault"), aff'd, 331 Conn. 628, 206 A.3d 160 (2019); *State* v. *Njoku*, 163 Conn. App. 134, 139–42, 133 A.3d 906 (holding that evidence was sufficient to sustain defendant's conviction of tampering with witness because, after rape of victim, execution of search warrant and collection of defendant's DNA, defendant asked intermediary to visit victim's family and to "try to convince them . . . [to] reach an agreement outside the court with him" (internal quotation marks omitted)), cert. denied, 321 Conn. 912, 136 A.3d 644 (2016); *State* v. *Pommer*, 110 Conn. App. 608, 619–20, 955 A.2d 637 (evidence was sufficient to establish that defendant tampered with witness in official proceeding because "[t]he defendant knew that the police were aware of the identities of the participants in the robbery" and that one participant "had turned herself in to the police" and implicated defendant), cert. denied, 289 Conn. 951, 961 A.2d 418 (2008).

In light of the foregoing principles, I believe that that the evidence was insufficient to support a reasonable inference that, at the time the defendant texted Rajewski, she had an intent to influence the testimony of a witness in a future official proceeding, as opposed to an intent to influence the statement of a suspect in the ongoing police investigation. The crime at issue was not serious—the state itself characterized the assault as "minor"[10]—and the likelihood of a full-blown prosecution in such cases is hardly a foregone conclusion. The realistic probability of formal proceedings also was diminished by the relatively equivocal nature of the evidence. There were no eyewitnesses to the assault aside from the participants, and they gave wildly different accounts of what had transpired—Moulson testified that he had been attacked by Rajewski and Babcock, whereas both Rajewski and Babcock testified that they had been attacked by Moulson.[11] In addition, the police had just begun their investigation, and, in the immediate aftermath of the altercation, it was unclear whether a crime had been committed, who had committed the crime, and whether any charges were likely to be filed. The minor nature of the crime, the conflicting accounts and muddled motivations of the participants, combined with their inebriated state at the time of the assault,[12] leads me to believe that an "official proceeding," although certainly *possible*, did not rise to the level of *probable*. See *State* v. *Reynolds*, 264 Conn. 1, 97, 836 A.2d 224 (2003) ("An inference is not legally supportable . . . merely because the scenario that it contemplates is remotely possible under the facts. To permit such a standard would be to sanction fact-finding predicated on mere conjecture or guesswork."), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see also *State* v. *Jordan*, supra, 314 Conn. 386 (holding that "the jury would necessarily have to stack inferences based on surmise to conclude that the defendant

believed that an official proceeding was probable" when he discarded clothing implicating him in attempted robbery while fleeing police). At most, the evidence reflects that the defendant intended to tamper with a witness in a police investigation, and, as previously explained, our witness tampering statute does not extend to "situations in which the defendant believes that only an investigation, but not an official proceeding, is likely to occur."[13] *State* v. *Ortiz*, supra, 312 Conn. 570.

To support its contrary conclusion, the majority relies on this court's statement in *Ortiz* that, anytime a defendant knows "that a witness with relevant information already has spoken with the police, a jury reasonably could infer that the [defendant] believed that the investigation probably would progress into an official proceeding."[14] Id., 571. This statement must be construed in light of the factual context in which the case arose—the crime at issue in *Ortiz* was serious (murder), the police investigation was extensive, the relevant information was damning (Ortiz' confession to the crime of murder), and Ortiz verbalized his belief that an official proceeding was likely to be instituted. Id., 555–58, 572–73. *Ortiz* does not stand for the blanket proposition that it is reasonable to presume that *every* police investigation will result in the initiation of an official proceeding or that every effort to tamper with a witness at the investigative stage will be sufficient to establish the intent to influence that witness in such a proceeding. Indeed, in *Ortiz*, this court emphasized that the defendant's state of mind, rather than the status of the police investigation, is the key to ascertaining whether the defendant's conduct falls within the scope of our witness tampering statute. See id., 571–72 ("it does not matter whether the police are at the investigation stage, the official proceeding stage, or any other stage; as long as the defendant acts with the intent to prevent a witness from testifying at an official proceeding, believing that such a proceeding will probably occur, the defendant has tampered with a witness within the meaning of § 53a-151 (a)"). The mens rea requirement ensures that the defendant "recognize[s] that his conduct threatens obstruction of justice"; (internal quotation marks omitted) id., 570; and "distinguish[es] culpable conduct from innocent conduct." (Internal quotation marks omitted.) Id., 564.

It is well established that "[i]ntent may be, and usually is, inferred from [a] defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances." (Internal quotation marks omitted.) Id., 565. The factual circumstances surrounding the defendant's conduct therefore are critically important in ascertaining whether it is reasonable to infer that she specifically intended to tamper with a "witness" in an "official proceeding" within the meaning of § 53a-151 (a). Common sense and experience teach us that the likelihood of a future official proceeding,

and the further likelihood of sworn testimony of the relevant witness being adduced at that proceeding, necessarily depends on various factors, including, but not limited to, the factors previously enumerated: the severity of the crime, the identity and importance of the witness, the quantity and quality of the evidence, and the status of the police investigation. Each case must be evaluated on its specific facts, and the focus must remain on the defendant's belief that an official proceeding involving the testimony of the witness likely will result. See *State* v. *Jordan*, supra, 314 Conn. 383 ("[t]his analysis ensures that the focus of the inquiry is on the culpability of the actor, rather than on external factors wholly unrelated to [the actor's] purpose of subverting the administration of justice" (internal quotation marks omitted)). To hold otherwise is to rewrite our witness tampering statute to include *all police investigations*, and this we cannot do. See *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, 279 Conn. 207, 216, 901 A.2d 673 (2006) ("It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is a function of the legislature." (Internal quotation marks omitted.)).

My conclusion, once again, is informed by the fact that our legislature purposefully omitted tampering with an individual in a police investigation from the purview of our witness tampering statute. That legislative choice is an important determination of public policy that cannot be stripped of all meaning. See *Lewis* v. *Gaming Policy Board*, 224 Conn. 693, 709, 620 A.2d 780 (1993) ("the primary responsibility for formulating public policy must remain with the legislature," not the courts (internal quotation marks omitted)). Nor can we ignore completely the rule of lenity. "[I]t is axiomatic that we must refrain from imposing criminal liability where the legislature has not expressly so intended." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 434, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); see also *State* v. *Drupals*, 306 Conn. 149, 160, 49 A.3d 962 (2012) ("[W]hen the statute being construed is a criminal statute, it must be construed strictly against the state and in favor of the accused. . . . [C]riminal statutes [thus] are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . Rather, penal statutes are to be construed strictly and not extended by implication to create liability which no language of the act purports to create." (Citations omitted; internal quotation marks omitted.)).

The majority's holding strays too far afield from the statutory text and materially alters its meaning in the process. The phenomenon is not uncommon—a statute is extended to its outer limit by construction in one or more judicial opinions, with each decision taking one successive step away from the original text by jumping

off from the gloss adopted in the previous case, until the gloss becomes the law itself, and the original text merely a distant speck on the horizon. Referring to this phenomenon, Judge Frank H. Easterbrook of the United States Court of Appeals for the Seventh Circuit cautioned: "As we are supposed to enforce the *statutes* [enacted by legislature], and not the glosses on those statutes, we must take care that the judicial process does not contribute to the distortion of meaning." (Emphasis in original.) *Hickey* v. *Duffy*, 827 F.2d 234, 242 (7th Cir. 1987). "Unless courts continually check back with the sources of their authority, the process of interpretation can become a rumor chain. Tiny variations at each retelling cascade, until the tale is unrecognizable to its originator." Id.; see also *National Labor Relations Board* v. *International Brotherhood of Electrical Workers, Local 340*, 481 U.S. 573, 597–98, 107 S. Ct. 2002, 95 L. Ed. 2d 557 (1987) (Scalia, J., concurring in the judgment) ("[T]he [c]ourt, having already sanctioned a point of departure that is genuinely not to be found within the language of the statute, finds itself cut off from that authoritative source of the law, and ends up construing not the statute but its own construction. Applied to an erroneous point of departure, the logical reasoning that is ordinarily the mechanism of judicial adherence to the rule of law perversely carries the [c]ourt further and further from the meaning of the statute. Some distance down that path, however, there comes a point at which a later incremental step, again rational in itself, leads to a result so far removed from the statute that obedience to text must overcome fidelity to logic."). In my view, the majority opinion has distorted the meaning of our witness tampering statute by applying a judicial gloss that extends criminal culpability to conduct that the legislature clearly and expressly intended to exclude from the scope of § 53a-151 (a), namely, a defendant's attempt to influence another person's statement to the police for the purpose of influencing a police investigation. I therefore dissent.

[1] During its deliberations, the jury asked to review Baker's police report but was informed that the report was "never presented as evidence during the course of this trial and therefore . . . you are not entitled to review [it]."

[2] It is unclear at certain points in Baker's testimony whether he is reading the text messages transcribed in his police report verbatim, summarizing them, or interjecting his own opinions about their content and intended purpose. To the extent that any ambiguity in the record exists, I resolve it in the light most favorable to sustaining the jury's verdict. See, e.g., *State* v. *Elmer G.*, supra, 333 Conn. 183 ("In reviewing a claim of insufficiency of the evidence, we construe the evidence in the light most favorable to sustaining the verdict. . . . We then determine whether the jury reasonably could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt." (Citation omitted.)).

[3] With respect to the purported falsity of the text messages, there was no evidence, for example, whether Moulson was abusive to the defendant, whether he stalked her, whether he had been in a bar fight earlier in the evening or whether he was bloody when he arrived at the house on Bunny Drive.

[4] For reasons that I discuss more fully in this opinion, I fundamentally disagree with the majority that, when "[v]iewed in its entirety, the state's closing argument relating to the witness tampering charge was not misleading." Footnote 10 of the majority opinion. As the majority acknowledges,

the state's theory of the case was that the defendant knowingly tampered with a witness in a police investigation and that such conduct, *standing alone*, was sufficient to satisfy the state's burden to establish the defendant's intent to interfere in an official proceeding. Our witness tampering statute, however, deliberately excludes "situations in which the defendant believes that only an investigation, but not an official proceeding, is likely to occur." *State* v. *Ortiz*, supra, 312 Conn. 570. Although evidence that the defendant was aware of the existence of a police investigation may, depending on the attendant factual circumstances, support an inference that the defendant intended to interfere with an official proceeding, the inferred fact regarding the defendant's subjective belief is an essential element of the crime that the state bears the burden of proving beyond a reasonable doubt. The state's theory of the case at trial, like the majority's analysis in this appeal, misconceives the state's burden of proof by treating mere knowledge of an active police investigation as a substitute for the statutory requirement that the defendant intend *to induce a witness to testify falsely in an official proceeding*, contrary to the plain language, intent, and purpose of our witness tampering statute, and contrary to controlling precedent.

[5] The word "testify" in § 53a-151 (a) is not defined in the definitional section of part XI of our penal code; see generally General Statutes § 53a-146; but, in this context—that is, when used in conjunction with the words "witness" and "official proceeding"—the term manifestly refers only to statements made *under oath*. See, e.g., *Sickle* v. *Torres Advanced Enterprise Solutions, LLC*, 884 F.3d 338, 349–50 (D.C. Cir. 2018) (relying on dictionary definition of testify: " '[t]o make a declaration of truth or fact under oath' "), quoting The American Heritage Dictionary of the English Language (New College Ed. 1976) p. 1330; *State* v. *Salafia*, 29 Conn. Supp. 305, 310, 284 A.2d 576 (1971) (*Shea, J.*) ("The power to compel 'testimony' imports the power to require an oath of a witness, because the word is usually defined as meaning oral statements of a person under oath. [Webster's Third New International Dictionary (1961) p. 2362; Black's Law Dictionary (4th Ed. 1968) p. 1646]."); see also Black's Law Dictionary (11th Ed. 2019) p. 1778 (defining "testimony" to mean, inter alia, "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition"); cf. *State* v. *Taborsky*, 139 Conn. 475, 487, 95 A.2d 59 (1953) ("[t]estimony given in court under oath is not in the same category as statements made to police officers outside of court").

[6] In my view, the foregoing statutory analysis finds additional, supplementary support in the later legislative proceedings examined at length in Justice D'Auria's dissenting opinion.

[7] The specific intent requirement contained in § 53a-151 cannot be minimized or brushed aside because it serves a vital constitutional function—without it, the statute would be vulnerable to a first amendment challenge. See *State* v. *Cavallo*, supra, 200 Conn. 672 ("We have held today that a defendant is guilty of tampering with a witness only if he intends that his conduct directly cause a particular witness to testify falsely or to refrain from testifying at all. So interpreted, § 53a-151 warns the public that it applies only to conduct intentionally undertaken to undermine the veracity of the testimony given by a witness. Members of the public therefore have no basis for concern that they might be subject to prosecution when their statements unwittingly cause a witness to testify falsely. As long as intent is a necessary element of the crime under § 53a-151, which penalizes only verbal acts relating to a specific pending prosecution, the statute casts no chilling effect on general exhortations concerning cooperation with judicial proceedings.").

[8] In my view, the majority mistakenly relies on the jury's rejection of the defendant's in-court testimony to supply the missing evidence of intent. For the reasons cogently explained in Justice D'Auria's dissenting opinion, the defendant's credibility, or lack thereof, in the course of providing testimony at trial is too remote and attenuated from her alleged commission of the crime to support a reasonable inference that, at the time she texted Rajewski in 2015, she intended to induce him to testify falsely at a future official proceeding. The jury plainly was free to disbelieve any or all of the defendant's testimony. It was not free, however, to infer from that disbelief that, because the defendant was the type of person who was willing to lie at trial, she also probably had the specific intent, seventeen months earlier, to tell Rajewski to lie to the police for the purpose of inducing him to testify falsely in a different official proceeding at some undetermined point in the future. Cf. Conn. Code Evid. § 4-5 (a) ("[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity,

or criminal tendencies of that person"); *State* v. *Smith*, 313 Conn. 325, 334, 96 A.3d 1238 (2014) ("[e]vidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime" (internal quotation marks omitted)); *State* v. *Meehan*, 260 Conn. 372, 395–96, 796 A.2d 1191 (2002) (drawing "distinction between using [uncharged misconduct] evidence to prove an act and using [such] evidence to prove intent" and holding that evidence of defendant's uncharged misconduct did not make it "more or less likely that the defendant" had specific intent to commit crime charged). By holding otherwise, the majority impermissibly dilutes the state's burden of proof on the essential element of intent in violation of the constitution. See, e.g., *State* v. *King*, 289 Conn. 496, 519, 958 A.2d 731 (2008) ("any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right" (internal quotation marks omitted)).

[9] The majority states that "[w]itness tampering charges may be brought in connection with any official proceeding, regardless of the seriousness of the underlying crime alleged in that proceeding . . . ." Footnote 14 of the majority opinion. I am not suggesting otherwise. My point is that the severity of the crime is a factor that should be taken into account as part of the inquiry into the defendant's mental state because, in the absence of any direct proof of intent, the context of the offense helps to inform that inquiry. Depending on the seriousness of the crime under investigation, the defendant may have different goals in mind when attempting to induce an individual to give false information to the police; in serious cases, the defendant may be thinking of a process involving not only an arrest but a trial and the prospect of a lengthy prison term; in a less serious situation involving trespassing or minor assault, for example, the defendant may be thinking of nothing beyond whether the subject of the investigation will be arrested. Our case law implicitly recognizes that the severity of the crime is part of the surrounding circumstances that inform the inquiry into the defendant's state of mind, i.e., whether the defendant subjectively believed that an official proceeding was likely to be instituted. For instance, in *State* v. *Sabato*, supra, 321 Conn. 748, although the Appellate Court upheld a defendant's conviction of tampering with a witness in connection with the relatively minor crime of theft of a cell phone, the defendant had articulated his intent to interfere with a future official proceeding, and, therefore, it was unnecessary to consider the circumstances surrounding the defendant's words and conduct in order to ascertain his state of mind. See id. (defendant's Facebook messages "acknowledged that the police were getting warrants and building a case against him" and that defendant intended to "eat the charge" (internal quotation marks omitted)). In contrast to *Sabato*, the defendant in the present case did not articulate her subjective intent. Accordingly, it is necessary to consider the circumstances surrounding the defendant's words and conduct, including the severity of the crime at issue in the future official proceeding, in order to determine whether the evidence is sufficient to support a finding that the defendant believed "that an official proceeding . . . [was] about to be instituted"; General Statutes § 53a-151 (a); when she texted Rajewski.

Contrary to the majority, I do not believe that a fact intensive inquiry, which includes as one factor relevant to the defendant's state of mind the severity of the crime at issue in the future official proceeding, will somehow encourage criminal behavior or invite unnecessary subjectivity, as the majority suggests. By identifying objective factors such as the severity of the crime to guide the inquiry, we actually will reduce the degree of subjectivity involved. It is axiomatic that "[i]ntent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Turner*, 252 Conn. 714, 748, 751 A.2d 372 (2000). The severity of the crime, like the other facts and circumstances surrounding a defendant's conduct, is circumstantial evidence of the defendant's intent.

[10] The police did not transport Moulson to the hospital for medical treatment of his injury. Instead, they arrested him and detained him overnight.

[11] The defendant's attempt to influence Rajewski's statement to the police appears to be consistent with Rajewski's testimony on this point.

[12] Rajewski testified that he had had "quite a few" alcoholic beverages at Pistol Pete's bar and was drunk at the time the assault occurred. Babcock testified that he also was drinking alcohol that evening and likely had any-

where from one to three beers.

[13] Tampering with a witness is a serious crime with severe penalties—it is a class C felony punishable by a term of imprisonment of "not less than one year nor more than ten years . . . ." General Statutes § 53a-35a (7); see also General Statutes § 53a-151 (b). Ironically, the minor crime of assault in the third degree, the investigation into which the defendant interfered in an effort to protect one or both of her boyfriends during the early morning hours of July 25, 2015, is a misdemeanor offense punishable by a maximum term of one year of imprisonment. See General Statutes § 53a-36 (1); see also General Statutes § 53a-61 (b).

[14] In *Ortiz*, this court contrasted the scenario in which there was no evidence linking an individual to a crime and, therefore, no reason to believe that the "the police would investigate the crime," with the scenario in which "an individual knows that there is significant evidence connecting him to the crime, or, even further, when the individual knows that a witness with relevant information already has spoken with the police . . . ." *State* v. *Ortiz*, supra, 312 Conn. 570–71. Only in the latter scenario could "a jury reasonably . . . infer that the individual believed that the investigation probably would progress into an official proceeding." Id., 571.

—————————————————